**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WISCONSIN**

STEPHANIE McALISTER,

      Plaintiff,

      v.                              Case No. 04-C-0691

MAXIMUS INC.,

      Defendant.

## DECISION AND ORDER
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On July 16, 2004, the plaintiff filed this action alleging that the defendant discriminated against her on the basis of her race and sex in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the Civil Rights Act of 1991, 42 U.S.C. § 1981. She also claims that the defendant discriminated against her on the basis of her sex in violation of the Equal Pay Act of 1962, as amended, 29 U.S.C. § 206(d) et seq. Specifically, the plaintiff claims that because of her race, sex and opposition to discrimination, "the defendant paid her less than a similarly-situated male employee, demoted her and terminated her, all resulting in loss of pay, benefits and career opportunities." (Complaint at 1).

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United

States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

The defendant filed a motion for summary judgment (Docket # 17). The motion is fully briefed and will be addressed herein.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324. "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to make a sufficient

-2-

showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322 (emphasis added).

On a motion for summary judgment, all inferences are taken in the light most favorable to the nonmoving party. Matter of Wade, 969 F.2d 241, 245 (7th Cir. 1992). Matters of credibility are not subject to resolution upon summary judgment. Wilson v. Williams, 997 F.2d 348, 350 (7th Cir. 1993). Moreover, the evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT&T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]; Fed. R. Civ. P. 56 [e]).

"It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact. Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719,, 724 [7th Cir. 1998]). An affidavit laden with conclusory legal statements and barren of any relevant facts of which the affiant had personal knowledge is not proper under Rule 56(e). See Resolution Trust Corporation v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992). Furthermore, a party may not create an issue of fact with an affidavit containing conclusions that contradict depositions or other sworn testimony. F.T.C. v. Bay Area Business Council, Inc., 423 F.3d 627 (7th Cir. 2005); Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005).

Proposed findings of fact which are based on hearsay are not included in the relevant facts set forth in this decision. See Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Arguments have no place in proposed findings of fact or

responses to such findings. See Civil Local Rule 56.2 (E.D. Wis.). Therefore, any such "finding" has not been included in the undisputed findings of fact. Finally, proposed factual findings which lack evidentiary support and responses to any such findings lacking evidentiary support do not create a triable issue of fact. Accordingly, they have not been included in the relevant undisputed facts.

### Relevant Undisputed Facts

**A.    THE PARTIES.**

Plaintiff Stephanie McAlister is an adult citizen of Wisconsin, who resides at 2209 N. 14th Street, Milwaukee, Wisconsin. She is an African-American female.

With a mission of "Helping Government Serve the People," the defendant, MAXIMUS, INC., provides services to public entities across the globe in (1) government program management and operations, (2) government consulting, and (3) government systems. In Wisconsin, MAXIMUS has contracted with the State of Wisconsin to act as one of the private agencies administering the Wisconsin Works (W2) program. The Wisconsin Legislature created the W2 program to assist program participants, who are primarily women with dependent children, achieve economic self-sufficiency through employment. At all relevant times, the headquarters of MAXIMUS' W2 Project were located at 1304 S. 70th Street, West Allis, Wisconsin.

**B.    THE PLAINTIFF'S EARLY EMPLOYMENT AT MAXIMUS.**

The defendant hired the plaintiff in May 1997. The plaintiff's offer letter stated that she was hired as a Financial Employment Planner (FEP) – Caseload Specialist. However, the plaintiff testified that she was told she would be a "Lead FEP." (Deposition of Stephanie McAlister [McAlister Dep.] at 35)

-4-

The FEPs act as the case managers for W2 program participants. The FEPs are responsible for, among other things, coordinating all case management services provided to participants and for monitoring participants' compliance with program requirements. The FEPs also ensure that all data relating to program participants is accurately entered into CARES, the official automated computer system for the W2 program. The State uses the information entered into CARES to track and evaluate whether the defendant is meeting its benchmarks under its contract.

As the Lead FEP, the plaintiff oversaw the work of a team of seven or eight FEPs. She, in turn, reported to a manager called the Team Champion. The plaintiff held the Lead FEP position for only six months, at which time she was promoted to the position of Outreach Coordinator. She was promoted to this position by a manager named Mona Garland without having to go through any application or posting process.

### C. THE PLAINTIFF'S PROMOTION TO THE MAXTRACKS OPERATIONS MANAGER POSITION.

On the plaintiff's account, the FEP function represents the core activity of the W2 project. In late 2000, the plaintiff applied for a position as the MAXTracks Operations Manager, a new position that would oversee both the FEP teams and the FEP supervisors. During her first three years at MAXIMUS, the only time the plaintiff supervised a team of FEPs was the six months she spent as the Lead FEP.

The plaintiff recognized that the MAXTracks Operations Manager was a very important position at the project because it involved the monitoring functions that directly impacted whether MAXIMUS met its contractual benchmarks. The functions of the MAXTracks Operations Manager previously had been handled by Paula Lampley, an African-American

female, who was the Deputy Director of the Wisconsin Project, in addition to her other responsibilities.

When the plaintiff applied for the Operations Manager position, Ms. Lampley was one of the people who interviewed the plaintiff. At the time the plaintiff applied for the position, Christine Danielson and Ricardo Ybarra also applied for the position.

The Human Resources (HR) Department at MAXIMUS put together a scoring system to rank the candidates for the position. According to the scoring system, the plaintiff was the best qualified for the position. In the application process, the plaintiff had two interviews with a group that included Ms. Lampley, Fiscal Manager Lilibeth Yao, an Asian female, and Human Resources Manager Racquel Roddy, an African-American female. Ms. Lampley believed the plaintiff was the most qualified for the Operations Manager position. She believed that the plaintiff had the 'people skills' to perform the Operations Manager job. (Deposition of Paula Lampley [Lampley Dep.] at 13; Lampley Dep. Ex. 1).

The plaintiff then interviewed with Ms. Lampley and William Macfadden, a Caucasian male, who was the W2 Project Director. During the interviewing process, William C. Goehring, the State administrator who acted as the liaison between MAXIMUS and the State, expressed to Mr. Macfadden that the MAXTracks Operations Manager position should be filled with someone who had case management and extensive W2 experience.

During the plaintiff's interview with Mr. Macfadden, he expressed reservations about her qualifications for the MAXTracks Operations Manager position. The plaintiff recalls that "[h]e was worried that the position I was doing was not equal to where I was moving to." (McAlister Dep. at 78-79). Mr. MacFadden was informed that the interviewing committee was recommending the plaintiff for the Operations Manager position. Mr. Macfadden gave her the

-6-

promotion on the recommendation of the Lampley team. Mr. Macfadden approved the selection of the plaintiff over a non-African-American applicant, Christine Danielson, who had more experience at MAXIMUS supervising FEPs. The plaintiff's promotion became effective December 1, 2000.

### D. THE PLAINTIFF AS THE MAXTRACKS OPERATIONS MANAGER.

The MAXTracks Operations Manager position was a highly technical position that required knowledge of what the performance benchmarks are in MAXIMUS's contract with the State, how the contract operates, and how the CARES system and, in particular, the reports generated under that system, relate to the benchmarks. This position reported to Ms. Lampley.

The FEP supervisors reporting to the plaintiff following her promotion included Ricardo Ybarra, an Hispanic male; Gabriella Borda-Rossel, an Hispanic female; Christine Danielson, a Caucasian female; Pam Ray, a Caucasian female; Luz Vasquez, an Hispanic female; and Melinda Calderon-Pitchford, an Hispanic female. Within eight hours of the plaintiff's promotion, some of these FEP supervisors went to Ms. Lampley and questioned the plaintiff's qualifications to handle the responsibilities of the MAXTracks Operations Manager position. They also complained to Ms. Lampley that they knew more than the plaintiff knew. Ms. Borda-Rossel and Ms. Danielson believed that while the plaintiff was their Operations Manager, there was no aspect of the job that the plaintiff performed well.

One of these FEP supervisors, Ms. Borda-Rossel, explained her concerns as follows: "My view of who should be the operations manager at that time was someone that was quite technically knowledgeable in CARES, that could interpret the data, that could sift through the data, and someone that had good case management skills . . . it took me by surprise when [the plaintiff] was made the operations manager. She was in charge of outreach." (Deposition of

-7-

Gabriella Borda-Rossel [Borda-Rossel Dep.] at 27). Ms. Lampley perceived that the FEP supervisors believed that they had more experience than the plaintiff.

After the plaintiff took over as the MAXTracks Operations Manager, the FEP supervisors went to Ms. Lampley to ask "case questions, questions about different files or cases about maybe JAL loans [job access loans]. It was specific to detailed work." Ms. Lampley would redirect them back to the plaintiff. (Lampley Dep. at 28). Early on, the FEP supervisors also complained to Ms. Lampley that the plaintiff was not giving them direction and that she communicated with them via e-mail instead of face-to-face.

In January 2001, after the plaintiff had held the MAXTracks Operations Manager position for about a month, Ms. Lampley, Ms. Roddy, and Mr. Macfadden met with the plaintiff to talk about her performance and the needs of her team. Ms. Lampley or Mr. Macfadden told the plaintiff that she should hold weekly meetings with her team and provide her team with clear direction. Ms. Lampley advised the plaintiff that "[e]verybody needs to be clear on what you actually would like from them, what is the goal, what are the objectives." (Lampley Dep. at 35). Ms. Lampley believed that the discussion with the plaintiff during this meeting was appropriate. She also believed that the plaintiff needed an improvement plan regarding how the plaintiff gave directives to her team.

Several of the plaintiff's FEP supervisors testified that they could recall having only two meetings with the plaintiff when she was their Operations Manager. Ms. Lampley attended meetings with the plaintiff and her team for a couple of weeks, but after those initial meetings, the plaintiff's meetings "faded out." (Lampley Dep. at 33). According to Melinda Calderon-Pitchford, one of the plaintiff's FEP supervisors, the plaintiff initially led weekly meetings of the FEP supervisors, but then stopped coming. In her declaration, the plaintiff stated that she held

-8-

weekly meeting with her subordinates more than two times while she was the Operations Manager.  During her deposition, she could not recall various meetings, but discussed notes from about five to seven undefined meetings over a span of eight months.  <u>See</u> McAlister Dep. at 129-44.

The plaintiff stated that she tried to hold weekly meetings with her subordinates more than two times while she was Operations Manager.  She testified that she has no documents or reports documenting the meetings or showing who attended them.

During her deposition, the plaintiff could recall giving only one directive to her FEP supervisors to assist them in meeting the contractual benchmarks during her tenure as the MAXTracks Operations Manager.  At the time of her deposition, she could not identify any policies or procedures that she implemented for the benefit of her staff.  According to Ms. Lampley, the plaintiff knew her job, including CARES, case management, the JAL process and how audits were performed.  Ms. Lampley told Mr. MacFadden that the plaintiff should be given the opportunity and enough time to prove herself.  When the plaintiff was Operations Manager, she asked for more support to help her with her job.

The plaintiff testified that she did not receive all the information from the Quality Assurance (QA) Department, including a report from the State that needed to be acted upon.  The plaintiff did not know for a fact that Mr. MacFadden withheld the report from her.  The plaintiff also testified that she did not receive the case load audit from the QA Department.  She spoke with the head of the department who told her he would make sure she got the information.  The plaintiff did not recall if she received the audits after that conversation.  The head of the department did not indicate that the plaintiff was not getting the audit reports because of Mr. MacFadden.

While the plaintiff was the Operations Manager, one of her main responsibilities was to meet all contractual benchmarks set by the State. Mr. Goehring did not approach Ms. Lampley with any complaints about the plaintiff not meeting his work needs. Ms. Lampley observed Mr. Goehring in the defendant's building and in meetings, but was unaware of the purpose of his visits or meetings. When the plaintiff was Operations Manager, MAXIMUS met all the contractual benchmarks it had to meet for the State.

During the time the plaintiff was the Operations Manager, Ms. Lampley saw FEP supervisors meeting with John Wilberding, who held the position of Quality Assurance/Quality Control Manager, and Mr. MacFadden. She did not know the purpose of the meetings or their content. The plaintiff stated that she was not invited to these meetings. Ms. Danielson testified that she spoke to Mr. Wilberding, the QA manager, daily about work-related matters. At some point, the plaintiff complained to Ms. Lampley that she was being discriminated against.

The FEP supervisors and Ms. Roddy met with Roger Cox while the plaintiff was the Operations Manager. The plaintiff was present at this meeting. During this meeting, Mr. Cox informed the FEP supervisors that they had to follow the chain of command.

Mr. Ybarra was selected to oversee a refugee unit while the plaintiff was his direct manager. Mr. MacFadden had nothing to do with Mr. Ybarra's participation in the project. The plaintiff was not informed that Mr. Ybarra had been selected to oversee this unit until after he informed her of this fact. Although the plaintiff did not attend the initial meeting, she attended later meetings regarding the refugee unit. Ms. Lampley discussed the matter with the plaintiff, kept her apprised and the plaintiff was then "in the loop." (Lampley Dep. at 58).

Mr. Ybarra made a request to Mr. Macfadden that he be given a cell phone. Mr. Ybarra did not make his request to the plaintiff, who was his manager at the time. He should have sent

-10-

this request to the plaintiff. The plaintiff gave a directive to Mr. Ybarra to discipline one of his subordinates when she was Operations Manager.

Mr. MacFadden moved an employee who was under the plaintiff's indirect supervision without telling her. The employee remained under the supervision of one of the plaintiff's FEP supervisors.

While the plaintiff was the Operations Manager, Ms. Borda-Rossel began working on setting up an adult day care unit which was proposed by the State in response to requests for extensions by Southeast Asians. Ms. Borda-Rossel did not consult with the plaintiff about setting up this adult day care unit. She assumed that the plaintiff had approved her participation in the program. Ms. Borda-Rossel sent an e-mail to Mr. Macfadden about the adult day care service. In the e-mail, she asked Macfadden if she needed to inform the plaintiff and Ms. Lampley about the status of the adult day care unit. The plaintiff should have been copied on the e-mail because she was Ms. Borda-Rossel's direct manager. (Deposition of William Macfadden [Macfadden Dep.] at 57).

While the plaintiff was the Operations Manager, Ms. Danielson went directly to Mr. Macfadden and Ms. Racquel Roddy about getting a raise for one of Ms. Danielson's supervisees, Holly Williamson. Ms. Danielson should have gone to the plaintiff first about getting a raise for Ms. Williamson because the plaintiff was Ms. Danielson's direct manager. Mr. MacFadden testified that he would not have approved the raise without the approval of the plaintiff and the Human Resources Department. If the plaintiff had been unavailable, Ms. Danielson should have gone to Ms. Lampley as the next in line. Ms. Danielson testified that the plaintiff was out of the office. She did not go to Ms. Lampley because she testified that Ms. Lampley also was out of the office for an extended period of time.

-11-

Ms. Danielson testified that she went to Mr. Macfadden for a raise in the winter of 2000-2001, although she could not recall the month. She testified that she recalled the time period because she was pregnant at the time and gave birth in June 2001. In late winter 2000 or early 2001, the plaintiff was not out on leave. Ms. Danielson signed the raise request on March 1, 2001, but Mr. Macfadden did not sign the leave request until April 16, 2001.

Mr. Wilberding called the plaintiff a "dog" in a meeting and also called the plaintiff "incompetent" and a "ninny" when in a room full of the plaintiff's staff, including Ms. Borda-Rossel. (Deposition of Melinda Calderon-Pitchford [Calderon-Pitchford Dep.] at 29-30). Ms. Borda-Rossel, Ms. Danielson and Mr. Ybarra denied ever overhearing Mr. Wilberding criticizing the plaintiff.

One of Ms. Borda-Rossel's primary responsibilities was to make sure that employability plans were up to date. She did not know if employability plans were one of the plaintiff's responsibilities. Ms. Borda-Rossel cannot recall one e-mail that the plaintiff sent her while the plaintiff was her manager. Ms. Lampley testified that Ms. Borda-Rossel complained to her that she could not understand the plaintiff's e-mails. Ms. Borda-Rossel was the direct contact person for Mr. Goehring on extensions. It was proper for Mr. Goehring to contact Ms. Borda-Rossel and not the plaintiff for extensions.

Ms. Borda-Rossel's only knowledge of the plaintiff's qualifications for the Operations Manager position was that the plaintiff had been the Outreach Coordinator. Ms. Borda-Rossel made a complaint to Ms. Lampley about the plaintiff's "[l]ack of direction in terms of what needed to be done in general to reach [the defendant's] benchmarks." (Borda-Rossel Dep. at 14). When she made this complaint, Ms. Borda-Rossel already knew what she needed to do for her job.

-12-

Mr. Ybarra complained to Ms. Lampley and Mr. Macfadden about the lack of communication. He did not inform the plaintiff about his meeting with Ms. Lampley and Mr. MacFadden. While the plaintiff was Mr. Ybarra's manager, he did not have any questions about how to perform his job.

Mr. Macfadden and/or Mr. Stepaniak were informed that another employee, Dawn Dachs, a Caucasian, had handled a JAL loan application in the same way in which the plaintiff had. Ms. Lampley told Mr. Macfadden that if the plaintiff was going to be terminated, then Ms. Dachs should be terminated. After Ms. Lampley made this statement, Mr. Macfadden no longer pursued termination. Ms. Lampley did not believe that the plaintiff should have been terminated over the handling of the JAL loan application.

On June 21, 2001, Akbar Piloti, President of the Workforce Services Division, visited the Wisconsin Project. He met with a group of W2 supervisors and managers at their request, including Ms. Borda-Rossel, Mr. Ybarra and Ms Danielson, FEP supervisors who reported to the plaintiff. Mr. Ybarra complained to Mr. Piloti about "a need for better communication, a need for perhaps more direction." (Deposition fo Ricardo Ybarra [Ybarra Dep.] at 28). These comments were of great concern to Mr. Piloti because he concluded that the plaintiff, who oversaw a vital piece of the Wisconsin Project's operations, did not have the confidence of her team. He communicated his impressions and concerns to Mr. Macfadden.

In June 2001, MAXIMUS conducted its annual Employee Satisfaction Survey. The MAXIMUS Employee Satisfaction Survey followed a different procedure in 2001. In 2001, the survey was directed to be turned into Kanwen Shao in the Quality Assurance Department. In prior years, it had been turned in to the Human Resources Department. In the survey, MAXIMUS asked its employees to provide input concerning their work, their supervisors, and

the company in general.  The surveys returned by employees at the Wisconsin Project contained criticisms of the plaintiff as a supervisor.  Ms. Borda-Rossel told Ms. Pitchford-Calderon in a meeting that the survey would be a "good opportunity to talk about how poor of a manager Stephanie was and how she didn't do her job and . . .."  (Calderon-Pitchford Dep. at 17).

Twelve (12) survey responses contained criticisms of the plaintiff.  Of these twelve (12) surveys, nine (9) also mentioned Ms. Lampley (either through name or title) and Ms. Roddy (either through name or title).

Specific remarks from the employees' surveys included the following:

While Mr. Macfadden has been doing an excellent job, . . . Ms. Lampley, Ms. Roddy, Ms. McAlister, . . . either through incompetence or an unwillingness to complete their duties, are putting the project at risk.  (Ricardo Ybarra)

My supervisor [Ms. McAlister] really has done nothing for me -- all I have become as a supervisor has been through my peers.  There is no guidance or support. The Deputy Director & my supervisor [Ms. McAlister] can rarely be found and if they can, they may take a bunch of notes and that is that.  Nothing -- almost nothing -- is ever resolved unless the supervisor staff takes the initiative. (Melinda Calderon-Pitchford)

It's my impression that the Deputy Director, MAXTracks Manager [Ms. McAlister], & Human Resource Manager don't have the skill level or competence to assist in the pro[gram]matic needs of the Agency.  I don't understand why certain people get promoted to higher position who don't have the knowledge or skills to be able to do the job that they been promoted to do . . ..  (Anonymous)

My job, while definitely interesting has not, within the last 8 months, provided an environment where I am able to effectively perform.  The lack of leadership, guidance and useful directive from my immediate supervisor [Ms. McAlister] is part of the reason.  She doesn't appear to have the technical skills necessary to manage this unit (MAXTrack).  (Pamela Ray)

I feel that the MAXTrack Manager [Ms. McAlister], W2 Deputy Director, and Human Resource Manager are not affective (sic) personnel . . ..  MAXTrack Manager is never around when you need her.  Everything is put on one specific FEP Supervisor.  (Anonymous)

-14-

New MAXTrack Supervisor [Ms. McAlister] . . . demonstrate[s] to be incompetent or ineffective to our company . . .. (Anonymous-FEP employee under the supervision of Ms. Borda-Rossel).

[My supervisor] wants me to do the Operations Manager's work because the Operations Manager doesn't know her job [Stephanie McAllister]. (Dawn Dachs)

Business operation has been operated at the supervisor level for the last two years. There has been very little or no support from management [Paula Lampley and Stephanie McAlister] in developing policies and procedures to provide effective case management. Problems . . . constantly arise and are resolved at the FEP supervisor level or the QA/QC unit. Why? Because management have no clue, no experience, nor the capability to solve the problem. (Anonymous)

The leadership in our operations area has no understanding of program requirements related to our contract with the state . . .. In short, they are incompetent – it's amazing this project has lasted this long without losing the contract . . .. I refer to operations management as an 'anchor' that is stopping the progress of the project . . .. We have several FEP supervisors who are knowledgeable and competent. If they were not held back by [Lampley] and [McAlister] and hampered by poor HR decisions, they could work with upper management to build a strong program. (Kay Kenealy)

(Declaration of Akbar Piloti [Piloti Decl.] ¶¶ 20, 22, Exh. E.)

Ms. Kenealy also stated the Ms. Lampley was trying to "run MAXIMUS into the ground." Id. She wrote that Ms. Lampley, Ms. Roddy and the plaintiff were holding the FEP supervisors back. Ms. Ray also wrote that she was "really tired of race and gender." Id.

Another FEP, under the supervision of Mr. Ybarra, stated that the "New Maxtrack Supervisor, Deputy Director and Human Resource person" are incompetent and ineffective. Id. An anonymous survey listed the "Deputy Director [Ms. Lampley], MAXTracks Manager [the plaintiff], and Human Resource Manager [Ms. Roddy] as lacking the skill level or competence to assist MAXIMUS's needs. Id.

Mai Xiong criticized management in his 2001 employee survey and at the bottom of his typed survey he wrote: "Management = Paula Lampley and Stephanie McAllister." Id. He

-15-

stated that management had "no clue, no experience, nor the capability to solve the problem." Id. He further commented that he thought it was "ridiculous to hide a person's competency under a protected class (color of your skin)." Id.

In his survey response, Mr. Wilberding criticized Ms. Roddy, Ms. Lampley, the plaintiff, Redmond and Shears. He characterized the plaintiff, Redmond and Shears as a "small group of hangers-on." Id. Wilberding also criticized the defendant's Corporate Human Resources Department. Mr. Wilberding further wrote:

> I would also take this opportunity to recognize the fact that the majority of people working here are very focused and have accomplished much. In particular I would say that the supervisors have done a commendable job. Christine Danielson, Gabriela Borda-Rosel, Ricardo Ybarra, and Luz Vasquez, have done an excellent job with little or no direction from their supervisors. Donald Xiong, Mai Xiong and Kanwen Shao have contributed an enormous amount to the success this project has enjoyed.

> . . . .

> Finally, Bill Macfadden has done an amazing job holding this project together. Without his efforts this project would not exist.

Id. None of these individuals are African-American.

Cassie Stribling, an African-American, reported directly to the plaintiff during the time of the 2001 employee survey. She gave the plaintiff neutral to good remarks on her evaluation. Ms. Danielson wrote in her survey that she did not "understand why employees are allowed to threaten MAXIMUS with unjustified discrimination lawsuits and continue to remain employed with the Company." (Deposition of Christine Danielson [Danielson Dep.] at 18).

Almost without exception, the employees who identified the plaintiff as their supervisor gave her the lowest possible numeric ratings ("1s" or "2s"). The number of surveys critical of the plaintiff outweighed the number of direct reports the plaintiff had. Mr. Piloti advised project

-16-

management, including Mr. Macfadden, that the survey responses raised serious questions regarding the plaintiff's effectiveness as the MAXTracks Operations Manager.

Ms. Pitchford-Calderon testified that as Operations Manager, the plaintiff was a "good manager as far as the people went and knowing how to deal with personnel issues and conflict with staff but she would not have been my first choice as far as knowledge of cares." (Calderon-Pitchford Dep. at 20).

Mr. Goehring, the State liaison, had to remind the plaintiff to submit a report on extensions of benefits that was supposed to be provided on a monthly basis. From his perspective, the plaintiff's failure to familiarize herself about critical W2 issues led him to rely on other employees at MAXIMUS to obtain assistance. He did not see the plaintiff at Milwaukee-wide meetings on W2 issues. When his calls to the plaintiff went unanswered or were not returned, he began to contact lower-level staff at MAXIMUS to obtain a timely response. Mr. Goehring expressed his concerns about the plaintiff to Mr. Macfadden. Mr. Goehring never contacted Ms. Lampley to discuss concerns about the plaintiff's performance as the Operations Manager.

Approximately five months after the employee surveys were completed, in November 2001, Ms. Lampley was voted "Most Outstanding Supporting Manager" by employees of the defendant. She also was voted "Most Professional Staff Person" by employees of the Defendant in November 2001. (Defendant's Response to Plaintiff's Request for Admissions ## 53-54).

-17-

## E. **PLAINTIFF'S LATERAL TRANSFER TO A DIFFERENT OPERATIONS MANAGER POSITION**

The plaintiff and her direct supervisor, Ms. Lampley, both acknowledge that a good manager must have the confidence of his/her staff. They agree that an employer legitimately could remove a manager who has difficulties with, or who has lost the confidence of his/her staff. MAXIMUS also must maintain a positive relationship with its contractual partner, the State of Wisconsin. Both Ms. Lampley and the plaintiff testified that MAXIMUS's managers must be responsive to the State's inquiries and make the State's requests a priority. The State must have confidence in the managers that MAXIMUS has in place and any complaints by the State about a MAXIMUS manager must be taken seriously.

In the early summer of 2001, as a result of the repeated criticisms of the plaintiff by her staff and the State, and his own impressions of her performance shortcomings, Mr. Macfadden concluded that the plaintiff could not do the job of MAXTracks Operations Manager. Mr. Macfadden believed that the plaintiff should be moved from the MAXTracks Operations Manager job to a position that better met her skill set. Ms. Lampley did not disagree with Mr. MacFadden decision that the plaintiff should be moved to a different position, but she told him that it should be a "comparable position," not a lower position. (Lampley Dep. at 67). Ms. Lampley similarly recognized that maybe "she need[ed] to be moved out of the position because . . . she couldn't handle it mentally anymore." (Lampley Dep. at 47.)

When Mr. Macfadden asked the plaintiff to transfer out of her Operations Manager position, she said that she would not transfer. Ms. Lampley talked to Mr. Macfadden about getting the plaintiff more support to do her current position. Mr. Macfadden stated that he wanted to move the plaintiff to a different position because he felt "that she could not do the

-18-

job." (Langley Dep. at 67). He told the plaintiff that he wanted to put two managers into the FEP area and that he had two other individuals who could do the job. Mr. MacFadden declined to give the plaintiff more support in her position.

Ms. Lampley subsequently developed a plan that restructured the Operations Manager function at MAXIMUS. As part of this plan, which became effective August 1, 2001, MAXIMUS went from two to four Operations Manager positions. Ms. Lampley assigned what she believed was a comparable level of work to the four positions. The functions previously overseen by the plaintiff were allocated to two Operations Managers. These two positions were given to Ms. Borda-Rossel and Mr. Ybarra, two of the FEP supervisors who previously reported to the plaintiff.

Ms. Lampley designed a new Operations Manager position (hereinafter Operations Manager 2) for the plaintiff, one which would oversee assessment, employment, education, and outreach. The plaintiff retained the title of Operations Manager. Some of the functions assigned to the plaintiff's position (including assessment and employment) were taken away from the oversight of Mario Zuniga. Mr. Zuniga assumed the fourth Operations Manager position, in which he retained responsibilities over intake and other front-end functions. The plaintiff's new position was not a comparable position to her former position and was not as integral to the success of the defendant as her previous position. Her new position had less contact with State staff. The plaintiff's new position was comparable to the positions of the other three employees who were in the Operations Manager positions post reorganization.

The plaintiff supervised fewer employees in her Operations Manager 2 position compared to her Operations Manager position. According to Ms. Lampley, the responsibilities assigned to the plaintiff's position were both substantial and a good fit for her qualifications.

-19-

The plaintiff kept her Operations Manager title. She continued to have supervisory authority and she maintained the same salary and benefits after the move. After she was moved to the new Operations Manager 2 position, the plaintiff's job responsibilities were not as critical to MAXIMUS' core operations, including case management.

### F.   THE PLAINTIFF'S ALLEGED COMPLAINT OF DISCRIMINATION.

Ms. Lampley testified that she and the plaintiff received a copy of an anonymous letter that was sent by a FEP to various individuals at MAXIMUS. The plaintiff complained to Ms. Lampley about the letter, stating that she felt she was being discriminated against. Ms. Lampley discussed the letter and the plaintiff's concerns about it with Mr. Macfadden and Ms. Roddy.

The plaintiff testified that she made a complaint of discrimination via e-mail to Ms. Roddy. The plaintiff does not have a copy of the e-mail. Ms. Roddy testified that she has no recollection of any events at MAXIMUS.

### G.   THE BUDGET SHORTFALL AND THE RESULTING REDUCTION-IN-FORCE.

In the fall of 2001, MAXIMUS received its allocation for its new contract with the State. Under this allocation, MAXIMUS faced a three million dollar budget shortfall. After examining and implementing various cost-saving measures, management at MAXIMUS's Wisconsin Project determined that eliminating this shortfall required a reduction in staff. Company management, including Mr. Macfadden, the W2 Project Director, and Jerry Stepaniak, Vice President, Workforce Services Division, discussed and made decisions regarding the need for, as well as the implementation of, the staff reductions. They developed a downsizing plan, the first step of which involved identifying the staffing level necessary to operate the Wisconsin

-20-

Project based upon workload demands, available levels of funding, and the requirements of the contract.

This analysis led to the recommendation that the Wisconsin Project had to reduce its workforce by approximately 28 staff members. In the hopes that it could reach its desired staffing level without resort to involuntary layoffs, MAXIMUS offered a voluntary layoff with a financial incentive to all individuals in all job classifications. Ten employees ultimately accepted the voluntary layoff. Despite these voluntary departures, additional staff reductions were required to address the budget shortfall. MAXIMUS had to identify those positions that were not essential to the project's continued operations.

Mr. Macfadden testified that the process involved "prioritizing, you just sit down and prioritize what's your highest priority and work your way down the list until you get to some things you're just going to have to learn to live without . . .. It's a process of prioritizing but based on program requirements and program needs." (Macfadden Dep. at 51-52). He also testified that seniority was not a factor, but that "if things were equal, then seniority would have played a role." Id. at 52. According to the plaintiff, Mr. Macfadden told staff at a meeting that there was going to be layoffs and that they would be based on the performance standards and seniority. (McAlister Dep. at 207-08). Mr. Macfadden told Katie Harris, an African-American female supervisor, that the layoffs would be based on "last ones in, first ones out." (Deposition of Katie Harris [Harris Dep.] at 47).

In examining the positions under the plaintiff's oversight, MAXIMUS could identify functions that it could eliminate without undermining its ability to provide the required level of quality and service to W2 participants. Mr. Macfadden and Mr. Stepaniak were the MAXIMUS employees who made the layoff decisions. In particular, it was their decision to eliminate the

-21-

education and outreach functions, two areas under the plaintiff's oversight. This decision resulted in the elimination of four positions, two of which were held by Caucasians.

After these eliminations, the remaining areas under the oversight of the plaintiff's Operations Manager position were assessment, employment, job access loans (JALs), and emergency assistance. Post-reductions, these functions were expected to be carried out by fewer than ten employees, none of whom were at a supervisory level. The team overseen by the plaintiff's Operations Manager position was the only team in the operations area which, after the elimination of non-essential functions, consisted of only a handful of employees, none of whom had supervisory status. Given the three million dollar reduction in MAXIMUS's contract with the State, MAXIMUS believed it could not justify retaining this limited group of functions as a separate team overseen by an Operations Manager-level position. Mr. Macfadden and Mr. Stepaniak made the decision to distribute these remaining functions to other existing managers and eliminate the plaintiff's Operations Manager position. More specifically, the assessment and employment areas were taken over by Kathleen Crape, an African-American female, while JALs and emergency assistance were transferred to Ms. Borda-Rossel.

The involuntary layoffs became effective on January 15, 2002. MAXIMUS involuntarily laid off 13 employees on that date, including the plaintiff. The group included ten females and three males, seven of whom were African-Americans. Six were non-African-Americans. Both before and after the reductions, MAXIMUS's workforce was over 40% African-American and over 70% female. African-Americans accounted for a larger percentage of MAXIMUS's workforce than any other racial group. By January 31, 2002, the defendant had terminated the plaintiff and Ms. Roddy. By the same date, Ms. Lampley had left the project.

-22-

### H.  THE PLAINTIFF'S COMPENSATION CLAIM.

The plaintiff's starting salary at MAXIMUS was $32,000 per year. At the time she applied for the MAXTracks Operations Manager position over three years later, she was earning approximately $39,000 per year.  The plaintiff had six months of experience supervising a team of FEPs before being appointed as the Operations Manager over the FEP units.

At the same time that MAXIMUS promoted the plaintiff, it also promoted an employee named Mario Zuniga, a Hispanic male, to the position of MAXAcademy Operations Manager. The MAXAcademy Operations Manager position was designed to oversee the "front end" functions at MAXIMUS, including intake, assessment, employment services, community service jobs, and the resource center.  (Macfadden Dep. at 16-17).  Mr. Zuniga joined MAXIMUS in September 1998 as a Team Champion over the FEP teams earning $42,000 per year.  This position was a higher level position than the Lead FEP and Outreach Coordinator positions held by the plaintiff.  Mr. Zuniga's title subsequently changed, without any demotion, and he retained his supervisory authority over the FEP functions.

As a result of annual increases, by the time Mr. Zuniga applied for the MAXAcademy Operations Manager position, he was earning $46,305.   In November 2000, Ms. Lampley prepared the paperwork requesting an increase in Mr. Zuniga's and the plaintiff's compensation in connection with their promotions to Operations Managers.  She requested an annual  salary increase to $52,000.00 for both individuals.  Mr. Macfadden approved this change for the plaintiff and Mr. Zuniga by his signature dated November 15, 2000.   The plaintiff and Mr. Zuniga signed the forms indicating the increase in their pay to $52,000 after Mr. Macfadden approved those increases.

-23-

At that time, MAXIMUS had a general guideline regarding compensation increases in connection with promotions that limited such increases to a maximum of 10% of the employee's prior compensation. MAXIMUS further required that any raises for project employees in excess of 10% of the employees' salary had to receive pre-approval from the president of the Workforce Services Division. This guideline was designed to promote uniformity in the amount of wage increases across the company and also to keep raises at a reasonable, appropriate level.

The raise approved by Mr. Macfadden for Mr. Zuniga represented a 12% increase over his prior salary. The raise approved by Mr. Macfadden for the plaintiff represented a 35% increase over her prior pay level – an increase over three times the 10% guideline. When Mr. Piloti, the President of the Workforce Services Division, received this paperwork, he called Mr. Macfadden. Mr. Piloti stated to Mr. Macfadden that he could not approve such a large percentage increase for the plaintiff. He directed Mr. Macfadden to reduce the increase to $50,000, or 25% of the plaintiff's prior salary.

Mr. Macfadden met with the plaintiff and advised her that Mr. Piloti did not approve the $52,000 number because it represented too large an increase over her prior salary. Mr. Macfadden apologized to the plaintiff for this decision. The plaintiff does not dispute that Mr. Piloti directed Mr. Macfadden to set her salary at $50,000.

Ms. Lampley and Ms. Roddy subsequently discussed salary issues with Dr. David Mastran, then the Chief Executive Officer of MAXIMUS. After this meeting, MAXIMUS raised McAlister's salary to $52,000 effective March 1, 2001.

-24-

## I.  THE PLAINTIFF'S CLAIMS OF DISCRIMINATION.

On April 3, 2002, the plaintiff filed a discrimination complaint with the Wisconsin Equal Rights Division (ERD), in which she asserted claims of discrimination and retaliation against MAXIMUS.  The plaintiff contends that MAXIMUS unlawfully discriminated against her on the basis of her race and sex when it paid her less than Mr. Zuniga, transferred her out of the MAXTracks Operations Manager position, and then eliminated her position.   During her deposition, the plaintiff testified that the company discriminated against her and that the only individual who she claims discriminated against her is Mr. Macfadden.  The plaintiff never heard Mr. Macfadden make a racially derogatory or sexist comment to or about her.  The only alleged "disparaging" comment by Mr. Macfadden that the plaintiff actually heard was a statement that she "was not a good fit for the position as the operations manager." (McAlister Dep. at 167-68.)

The plaintiff's claim that Mr. Macfadden withheld unspecified information that she needed to do her job is based on her "assumption" that he had some role in keeping the information from her.  (McAlister Dep. at 170-172).  The plaintiff thought that Ms. Lampley was a good manager.

### ANALYSIS

### Title VII & § 1981

The plaintiff contends that she was demoted and later terminated on account of her race in violation of 42 U.S.C. § 1981 and on account of her race and sex in violation of the Civil Rights Act of 1964, 43 U.S.C. § 2000e et seq..  The defendant asserts that the plaintiff's race and gender discrimination claims brought pursuant to Title VII and her race discrimination claim brought pursuant to § 1981 lack merit.  Specifically, the defendant asserts that the plaintiff has

-25-

failed to establish a prima facie case of discrimination. The defendant further asserts that the plaintiff has failed to establish that its actions were pretextual.

In response, the plaintiff asserts that genuine issues of material fact exist and, therefore, summary judgment is inappropriate. The plaintiff asserts that she has established "many different pieces of evidence none of which, standing alone, would prove discrimination. However, when the different pieces of evidence are combined, a mosaic, of which kind the Troupe v. May Dept. Stores Co., 20 F.3d 734 (7th Cir. 1994)] court envisioned, is created." (Brief in Support of Plaintiff's Motion Opposing Defendant's Motion for Summary Judgment [Plaintiff's Response Brief] at 3). The plaintiff further asserts that she was meeting her job expectations, or, in the alternative, that the defendant's legitimate expectations were themselves pretextual. The plaintiff also contends that the demotion constituted an adverse employment action and that the defendant's stated reasons for her demotion and termination are pretextual.

Title VII of the United States Code makes it unlawful for an employer to ". . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . .." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, as is enjoyed by white citizens. . . ." and defines making and enforcing of contracts as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981. A prima facie case of race discrimination under § 1981 is predicted on the

-26-

same elements as a claim under Title VII and, therefore, the court analyzes them together. See Lalvani v. Cook County, Illinois, 269 F.3d 785, 789 (7th Cir. 2001).

A plaintiff in a discrimination case may prove intentional discrimination by using either the "direct method" or the "indirect method." See Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004). "Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). The evidence may be direct or circumstantial. Rhodes, 359 F.3d at 504. However, a proffer of direct evidence must relate to the specific employment decision in question. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997).

The indirect method requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); see also, Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994). Initially, the burden is on the plaintiff to establish a prima facie case of discrimination.

To establish a prima facie case of discrimination, the plaintiff must show: 1) that she belongs to a protected group; 2) that she performed the job satisfactorily; 3) that she suffered an adverse employment action; and 4) that the employer treated similarly situated employees outside the protected group more favorably. Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc., 210 F.3d 750, 752 (7th Cir. 2000) (citing Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 [7th Cir. 1999]). If the plaintiff establishes all the elements of a prima facie case, the plaintiff raises an inference of discrimination. See Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994).

-27-

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision. Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual. See Kirk, 22 F.3d at 138. The plaintiff may prove pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for the adverse employment action] is unworthy of credence." Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1303 (7th Cir. 1991) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 [1981]).

In this case, the plaintiff first contends that there exists direct circumstantial evidence of discrimination. Specifically, the plaintiff asserts that "when the following pieces of evidence are read together, as a mosaic, the sum of their parts explain why [she] is complaining of race and sex discrimination:

> a. The FEP Supervisors complained that the plaintiff could not handle the job responsibilities of the Operations Manager 1 position within eight hours of the plaintiff receiving the promotion.
> b. Both Bill MacFadden and John Wilberding would meet with the plaintiff's direct reports without the plaintiff's or Ms. Lampley's knowledge.
> c. Information was withheld from both the plaintiff and Ms. Lampley which was critical to their ability to perform their jobs.
> d. The plaintiff's direct reports would circumvent her, and often times Mr. Lampley and go directly to Mr. Macfadden if they needed or wanted anything.
> e. The plaintiff was treated differently than a Caucasian employee by Mr. Macfadden with regard to JAL loans,
> f. The 2001 Employee Satisfaction Surveys, upon which the defendant relies heavily, appear from the evidence to be illegitimate.
> g. The plaintiff requested additional management support in her Operation Manager 1 position and Mr. Macfadden refused to give it to her.
> h. After the plaintiff was demoted, two people filled her former job, proving that the plaintiff should have been given the additional management support.

-28-

> i. The complaints of the FEP Supervisors are illegitimate and dishonest and a reasonable person would not have given them weight regarding their evaluation of the plaintiff as Operations Manager 1.
>
> j. The testimony of the FEP Supervisors that has been taken in this matter show that there are being dishonest; they contradict themselves with documents, are uncooperative and occasionally display a surprising lack of memory.
>
> k. From late 2001 through January 2002, the top three African-American female employees at the MAXIMUS Milwaukee project, who all held prestigious positions, were all terminated or forced out."

(Plaintiff's Response Brief at 5).

The court of appeals for this circuit explained that "there are three means by which a plaintiff can defeat summary judgment using circumstantial evidence under the direct method." Phelan v. Cook County, 463 F.3d 773, 781 (7th Cir. 2006). "The first is through the demonstration of 'suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" Id. (quoting Rudin v. Lincoln Land Community College, 420 F.3d 712, 720-21 [7th Cir. 2005]). "The second is through evidence that a similarly situated employee received more favorable treatment, and the third is through 'evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief.'" Phelan, 463 F.3d at 781 (quoting Rudin, 420 F.3d at 720-21).

To prevail, however, the plaintiff must construct "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" Rhodes, 359 F.3d at 504 (quoting Troupe, 20 F.3d at 737). Moreover, the circumstantial evidence "'must

-29-

point directly to a discriminatory reason for the employer's action.'" <u>Rhodes</u>, 359 F.3d at 504 (quoting <u>Adams v. Wal-Mart Stores, Inc.</u>, 324 F.3d 935, 939 [7th Cir. 2003]).

With respect to the second and third means by which a plaintiff can defeat summary judgment using circumstantial evidence, the plaintiff presents no evidence that a similarity situated employee received more favorable treatment and no evidence that she was replaced by a person who was neither female nor African-American. Moreover, none of the plaintiff's evidence falls within the first means by which a plaintiff can defeat summary judgment using circumstantial evidence. The plaintiff has presented no facts indicating anything suspicious about the timing of her demotion or her termination, no ambiguous statements attributable to the defendant or incidences of behavior toward or comments directed at other employees who were either female or African-American. Thus, all that remains is "other bits and pieces from which an inference of discriminatory intent may be drawn." <u>See</u> <u>Rudin</u>, 420 F.3d at 721.

A significant amount of the plaintiff's circumstantial evidence relates to her subordinates' treatment of her. The prejudice of a subordinate can be imputed to the employee who has formal authority over the plaintiff's job, if "the subordinate, by concealing relevant information from the decision-making employee or by feeding false information to him, is able to influence the decision." <u>Wallace v. SMC Pneumatics, Inc.</u>, 103 F.3d 1394, 1400 (7th Cir. 1997). However, this is not such a case. Here, there is no evidence that the FEP supervisors concealed relevant information or provided false information to the decisionmaking employees, Mr. MacFadden and Mr. Stepaniak. The record is devoid of any evidence that the decisionmakers were influenced by the comments of the FEP supervisors. Moreover, no evidence in the record suggests that the FEP supervisors' criticisms of the plaintiff were motivated by race or sex.

-30-

The fact that the FEP supervisors complained to Ms. Lampley about the plaintiff as Operations Manager soon (within 8 hours) after she received the position would not allow a jury to infer intentional discrimination by the decisionmaker as neither Ms. Lampley nor the FEP supervisors made the decision to demote or terminate her. Moreover, Mr. Macfadden's decision to promote the plaintiff was what precipitated the comments. Similarly, the fact that the employees who directly reported to the plaintiff were meeting with Mr. Macfadden and Mr. Wilberding without her knowledge or permission does not provide a basis to infer intentional discrimination by the decisionmaker. It certainly does not "point directly to a discriminatory reason for the employer's actions." See Adams, 324 F.3d at 939.

The plaintiff asserts that the 2001 Employee Satisfaction Surveys cannot be believed. Whether the Employee Satisfaction Surveys were "rigged" as the plaintiff maintains or a true representation of the honest opinions of the plaintiff, see Calderon-Pitchford Deposition at 21, is inconsequential. That is because, as previously stated, the record is devoid of any evidence that the subordinates' opinions of the plaintiff were motivated by race or sex.

Moreover, even if the complaints of the FEP supervisors were "illegitimate and dishonest" as the plaintiff contends, there is no evidence that the decisions to move the plaintiff to another position and later to terminate her were influenced by those complaints. See Wallace, 103 F.3d at 1400. Furthermore, whether the deposition testimony of the FEP supervisors in this case is dishonest or not does not "point directly to a discriminatory reason" for the actions of the employer. See Rhodes, 359 F.3d at 504.

The plaintiff also asserts that after she became the Operations Manager, crucial information was withheld from her. The plaintiff just assumed that Mr. MacFadden had some role on keeping this information from her. The plaintiff does not indicate specifically what

-31-

information was withheld or who (which is important) withheld it. Without such information, the plaintiff's assertion adds nothing to the mosaic of circumstantial evidence.

So then what is left of the plaintiff's "convincing mosaic" is the following: (1) the plaintiff was treated differently than a Caucasian employee by Mr. Macfadden regarding JAL loans, (2) Mr. Macfadden refused to give the plaintiff additional management support in her Operations Manager position, (3) from late 2001 through January 2002, the top three African-American female employees of the defendant were terminated or forced out, and (4) those positions were not filled by any African-Americans.

With respect to the issues of the JAL loan, Mr. Macfadden's refusal to give her additional support and the fact that after her demotion two people filled her position, the plaintiff fails to cite specific evidentiary support for her factual propositions as required by Civ. L.R. 56.2(d).[1] Moreover, even if supported, the fact that Mr. Macfadden refused to give the plaintiff additional management support does not create an inference of intentional discrimination. The court can conceive of several reasons for Mr. Macfadden's decision and nothing in the record indicates it was discriminatory. In fact, Mr. Macfadden testified that giving the plaintiff additional management support would not solve her problems which included poor relations with the FEP supervisors and the State. See Macfadden Deposition at 29. In addition, the evidence establishes that Mr. Macfadden did not treat the plaintiff differently than a Caucasian employee

---

[1] Civil Local Rule 56.2(d) (E.D. Wis.) provides in relevant part:

All factual assertions made in any brief must be supported by both specific citations to evidentiary materials in the record and the corresponding stipulated fact or proposed finding of fact.

The plaintiff also fails to provide specific evidentiary support in her brief for some other factual propositions as required by Civ. L.R. 56.2(d).

-32-

with respect to a JAL loan issue.  <u>See</u> Lampley Deposition at 74-75, Macfadden Deposition at 36-37.  Thus, what remains is the plaintiff's mere assertion that from 2001 through January 2002, the defendant terminated the top three African-American female employees and did not fill the positions with any African-Americans.

The undisputed facts establish that although Mr. Macfadden asked the plaintiff to transfer out of her Operations Manager position, the plaintiff refused to do so.  The facts also establish that Ms. Lampley subsequently developed a plan that restructured the Operations Manager function at MAXIMUS which increased the number of Operations Managers from two to four.  Although the plaintiff supervised fewer employees in the new position and her job responsibilities were not as critical to MAXIMUS' core operations, the plaintiff kept her title, continued to have supervisory authority, and maintained the same salary and benefits.

The undisputed facts also establish that in the fall of 2001, the defendant faced a three million dollar budget shortfall.  Management personnel eventually determined that eliminating the shortfall would require a reduction in staff.  Although ten employees accepted a voluntary layoff, more layoffs were necessary to address the budget shortfall.  The undisputed facts show that MAXIMUS identified those positions that were not essential to the project's continued operations.  In doing so, it identified functions it could eliminate without undermining its ability to provide the required level of quality and service to W2 participants.  Two of the identified functions were education and outreach – both of which were under the plaintiff's oversight.  In eliminating these two functions, four positions were eliminated.

After these functions were eliminated, the remaining areas under the plaintiff's oversight were expected to be carried out by fewer than ten employees, none of whom were at a

-33-

supervisory level. Thus, the team overseen by the plaintiff was the only team which consisted of only a handful of employees, none of whom had supervisory status.

The undisputed facts further establish that MAXIMUS, facing a three million dollar reduction in funding, concluded that it could not justify retaining this limited group of functions as a separate team overseen by the plaintiff. Therefore, it distributed the functions to other existing managers (both of whom were female and one of whom was African-American) and eliminated the plaintiff's position. Contrary to the plaintiff's contentions, the undisputed facts do not indicate who filled the positions formerly held by the other two of the top three African American female employees at MAXIMUS. The undisputed facts establish, however, that both before and after the reductions, MAXIMUS' workforce was over 40% African-American and over 70% female. Accordingly, the plaintiff failed to establish discrimination using circumstantial evidence under the direct method. Thus, the court will now determine whether the plaintiff established discrimination under the indirect method.

The plaintiff, as an African-American woman, belongs to two protected groups. As previously indicated, to establish a prima facie case of discrimination under Title VII and § 1981, the plaintiff also must show that overall she was performing her job satisfactorily, that she suffered an adverse employment action and that the defendant treated other similarly situated employees outside the protected group more favorably.

The plaintiff maintains that she was meeting her job expectations. Specifically, the plaintiff asserts that because the defendant met all its contractual benchmarks and because she was commended for her work with the audits of the defendant, was not disciplined or counseled and because many employees came to her with complaints, she was meeting her job expectations. However, the plaintiff's assertions are belied by the undisputed facts which show

-34-

that the plaintiff lacked the confidence of her staff and had some difficulties complying with certain State procedures. The FEP supervisors complained to Ms. Lampley that the plaintiff was not giving them direction and that she communicated with them via e-mail instead of face-to-face. Additionally, several of the plaintiff's FEP supervisors testified that they could recall having only two meetings with the plaintiff when she was their Operations Manager. The plaintiff herself could recall giving only one directive to her FEP supervisors to assist them in meeting the contractual benchmarks during her tenure as Operations Manager. At the time of her deposition, the plaintiff could not identify any policies or procedures that she implemented for the benefit of her staff.

The undisputed facts also establish that the plaintiff had some difficulties in her dealings with the State. Specifically, Mr. Goehring, the State liaison, had to remind the plaintiff to submit a report on extensions of benefits that she was supposed to provide on a monthly basis. According to Mr. Goehring, the plaintiff failed to familiarize herself with critical W2 issues and, therefore, he relied on other employees at MAXIMUS to obtain assistance. The plaintiff also did not return his calls so he began to contact lower-level staff for a response.

The plaintiff maintains that it is not necessary to establish that she was performing her job satisfactorily if she can demonstrate that her "employer's legitimate expectations were themselves pretextual," citing Brummett v. Lee Enterprises, Inc., 284 F.3d 742, 744 (7th Cir. 2002). Although "[t]he plaintiff must meet each prong of the prima facie test before it becomes necessary to reach the issue of pretext," Brummett, 284 F.3d at 744, "in limited circumstances a plaintiff may be able to meet the second part of the prima facie case without showing that he met his employer's legitimate expectations." Id. at 745. The court explained that "an individual who meets the other criteria for a prima facie case and also demonstrates that the employer's

-35-

legitimate expectations were themselves pretextual can survive the first prong of McDonnell Douglas." Id. (citing Fuka v. Thomson Consumer Electronics, 82 F.3d 1397, 1404 [7th Cir. 1996]).

In this case, however, the plaintiff fails to demonstrate that the defendant's legitimate expectations were pretextual. Accordingly, the plaintiff must establish that she was meeting her job expectations. As previously discussed, the undisputed facts establish that the plaintiff was not meeting her job expectations prior to her demotion. The plaintiff asserts that in determining whether she was performing her job satisfactorily before her termination, the court must consider her performance in the Operations Manager 2 position. The plaintiff maintains that she performed her Operations Manager 2 position satisfactorily.

However, the court need not determine whether the plaintiff was meeting her job expectations because the plaintiff cannot establish that the defendant treated similarly situated employees outside the protected group more favorably. The plaintiff argues that her failure to identify a similarly situated employee is not fatal to her case. The plaintiff states that she was in a high level position which can only be compared to the other Operations Manager position which was held by Mario Zuniga. The plaintiff further asserts that because her job responsibilities were unique to her position she would never be able to establish the similarly situated requirement. The plaintiff cites Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998) in support of her assertions.

The defendant correctly points out, however, that in Ercegovich, the Court of Appeals for the Sixth Circuit, did not hold or even imply that a plaintiff need not prove the last element of the prima facie case. Rather, the court held that the similarly situated person need not be identically situated to the plaintiff.

-36-

The only similarly situated person identified by the plaintiff is Operations Manager Mario Zuniga. The plaintiff asserts that although Mr. Zuniga was also demoted, he "did not lose many of his job responsibilities." (Plaintiff's Response Brief at 25). The plaintiff further asserts that she was "hit drastically harder with this repositioning, losing numerous job responsibilities, supervisory authority, prestige and career prospects." Id. The plaintiff maintains that the fact that she was given less important responsibilities is evident because her job and not Mr. Zuniga's job was deemed expendable at the time of the January 2002 layoffs.

The undisputed facts, however, establish that the plaintiff's transfer out of the Operations Manager position was part of a restructuring of the entire Operations Manager tier. As a result of the restructuring, both the plaintiff and Mr. Zuniga lost some of their responsibilities. In fact, a number of Mr. Zuniga's responsibilities, including assessment and outreach, were redistributed to the plaintiff. Although the plaintiff was not placed in a position comparable to her previous position, both the plaintiff and Mr. Zuniga were placed in comparable positions after the reorganization.

Although the plaintiff undisputedly suffered an adverse employment action when she was terminated, she also asserts that her demotion was an adverse employment action. The plaintiff states that after the demotion, she lost the FSET program, the Food Stamp program, the W-2 program and the satellite sites. The plaintiff also asserts that she supervised far fewer employees and possessed far fewer responsibilities in her new position. The plaintiff contends that the new position was less prestigious, had less contact with the State and reduced her career prospects. The plaintiff maintains that "[t]aking away job responsibilities constitutes an adverse employment action." She cites Crady v. Liberty Nat. Bank and Trust Co. of Indiana, 993 F.2d 132 (7th Cir. 1993), in support of her assertion.

-37-

In <u>Crady</u>, the court, citing its decision in <u>Brown v. M & M/Mars</u>, 883 F.2d 505 (7th Cir. 1989) stated: "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." 933 F.2d at 135. The court also made it clear, however, that an adverse action must be materially adverse to be actionable, meaning more than "a mere inconvenience or an alteration of job responsibilities." <u>Id.</u>; <u>see</u> <u>also</u>, <u>Oest v. Illinois Dept. of Corrections</u>, 240 F.3d 605, 612 (7th Cir. 2001)

In this case, the responsibilities assigned to the plaintiff in her Operations Manager 2 position were substantial and a good fit for her qualifications. The plaintiff continued to have supervisory authority and maintained the same salary and benefits after the move. The plaintiff's responsibilities undoubtedly changed as part of the restructuring. While there was an alteration of her job responsibilities, she has not demonstrate that her material responsibilities significantly diminished.

The court has construed the relevant undisputed facts in the light most favorable to the plaintiff. Nonetheless, based on those undisputed facts, this court concludes that the plaintiff has failed to establish a <u>prima</u> <u>facie</u> claim of discrimination under either Title VII or § 1981.

In sum, the plaintiff has not established that she was suffered an adverse employment action when she was demoted and that other similarly situated employees outside the protected group were treated more favorably. Accordingly, the plaintiff has failed to establish a <u>prima</u> <u>facie</u> case of discrimination based on either her race or sex. <u>See</u> <u>Buie v. Quad/Graphic, Inc.</u>, 366 F.3d 496, 504 (7th Cir. 2004); <u>Maarouf</u>, 210 F.3d at 752; <u>Stalter</u>, 195 F.3d at 289.

-38-

Therefore, the defendant's motion for summary judgment on the plaintiff's Title VII and § 1981 discrimination claims will be granted.

**Title VII Retaliation**

Establishing a prima facie case of retaliation in violation of Title VII is similar to establishing a prima facie case of discrimination in violation of Title VII. Thus, the plaintiff may establish a prima facie case of retaliation either through the direct method or the indirect method. See Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005). Under the direct method, the plaintiff must present direct evidence of: 1) a statutorily protected activity; 2) an adverse action taken by the employer; and 3) a causal connection between the two. Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002). Under the indirect method, the plaintiff must show that: 1) she engaged in a statutorily protected activity; 2) she performed her job according to her employer's legitimate expectations; 3) despite her satisfactory job performance, she suffered an adverse action from the employer; and 4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Buie, 366 F.3d at 504; Stone, 281 F.3d at 644.

In this case, the plaintiff only asserts that she has established a prima facie case of retaliation under the indirect method. However, the plaintiff analyses her retaliation claim under the direct method.[2] The plaintiff maintains that she engaged in a protected activity, namely, she approached Ms. Lampley about her belief that she was being discriminated against on the basis of her race and gender. She further argues that she suffered an adverse employment action

---

[2]The case cited by the plaintiff, Payne v. Milwaukee County, 146 F.3d 430, 433-34 (7th Cir. 1998), does set out as the elements of a prima facie case under the indirect method the elements of a prima facie case under the direct method.

Case 2:04-cv-00691-PJG    Filed 12/12/06    Page 39 of 42    Document 77

when she was demoted, and because Mr. Macfadden had knowledge of her protected activity, there was a causal connection between her protected activity and her demotion.

The plaintiff cites <u>Luckie v. Ameritech Corp.</u>, 389 F.3d 708, 714-15 (7th Cir. 2004), for the proposition that "[i]n order to establish a causal connection between her complaints of discrimination and her demotion McAlister must show that MacFadden had knowledge of her protected activity." (Plaintiff's Response Brief at 30). In <u>Luckie</u>, the court stated: "At minimum, . . . [the plaintiff] must offer evidence that would support a reasonable inference that [the decisionmaker] was aware of [the plaintiff's] allegations of discrimination." <u>Luckie</u>, 389 F.3d at 715. The court explained that it is not sufficient that a decisionmaker could or even should have known about a plaintiff's complaints. Rather, the decisionmaker "must have actual knowledge of the complaints for [the] decisions to be retaliatory." <u>Id.</u> at 715.

Here, the undisputed facts establish that the plaintiff and others received an anonymous letter from a FEP and that, as a result, the plaintiff complained to Ms. Lampley that she felt that she was being discriminated against. Ms. Lampley discussed the letter with Mr. MacFadden and Ms. Roddy. However, there is no indication when this anonymous letter was circulated and when the plaintiff voiced her complaint to Ms. Lampley. Thus, there is no evidence to establish that the plaintiff complained of discrimination before her transfer to the Operations Manager 2 position.

The undisputed facts also establish the plaintiff made a complaint of discrimination via e-mail to Ms. Roddy. The plaintiff does not have a copy of the e-mail and Ms. Roddy has no recollection of any events at MAXIMUS. Because the plaintiff failed to establish when she made her complaint of discrimination, she cannot establish retaliation for making that complaint. Furthermore, even if she could establish when the complaint occurred, her retaliation claim fails

-40-

for the same reasons her discrimination claims based on her demotion fail, namely that she failed to demonstrate that she performed her job satisfactorily, that she suffered an adverse employment action and that the employer treated similarly situated employees outside the protected group mor favorably. Accordingly, the defendant's motion for summary judgment as to the plaintiff's retaliation claim will be granted.

**Equal Pay Act**

The plaintiff asserts that by briefly paying her less than Mr. Zuniga, a male Operations Manager, the defendant violated the Equal Pay Act, 29 U.S.C. § 206(d) (EPA). The defendant maintains that the plaintiff's EPA claim is time barred. Alternatively, the defendant asserts that it briefly paid Mr. Zuniga more than the plaintiff based upon a reasonable factor other than sex. In response, the plaintiff asserts that the case law cited by the defendant in support of its position that her EPA claim is untimely is inapplicable. The plaintiff also maintains that the pay differential between herself and Mr. Zuniga was not reasonable.

Either a two-year or three-year statute of limitations applies to claims brought pursuant to 29 U.S.C. § 255(a). A two-year statute of limitations applies to "non-willful" violations and a three year limitations period for "willful" violations. Id. In this case, the pay differential between the plaintiff and Mr. Zuniga occurred between December 1, 2000 and March 1, 2001. The plaintiff filed her complaint on July 16, 2004, more than three years after the pay differential had been eliminated. Thus, the plaintiff's EPA claim is untimely unless the filing of an EEOC complaint tolls the time within which the plaintiff has to file an EPA claim.

In Washington County v. Gunther, 452 U.S. 161 (1981), the Supreme Court held that the EPA and Title VII are separate and independent remedies for sex discrimination. Because these statutes provide separate and independent remedies, filing a charge with the EEOC does

-41-

not toll the statute of limitations under the EPA.  See Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454 (1975) (holding that because § 1981 and Title VII provided separate and independent remedies for race discrimination, filing a charge with the EEOC does not toll the statute of limitations on a § 1981 claim).

Thus, the court concludes that the plaintiff's EPA claim was not timely filed.  The defendant's motion for summary judgment on the plaintiff's Equal Pay Act claim will be granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** the defendant's motion for summary judgment be and hereby is **granted**.  (Docket # 17).

**IT IS ALSO ORDERED** that this action be and hereby is **dismissed**.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of December, 2006.

BY THE COURT:


  s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge

O:\CIV\McAlister sj ord.wpd

-42-